ROCKLAND COUNTY.—HON. GEO. W. WEIANT, SURROGATE.—April, 1888.

MATTER OF BUTLER.

*In the matter of the judicial settlement of the accounts of* ALFRED M. WILES *and* JOHN BUTLER, *as executors of the will of* PATRICK BUTLER, *deceased.*

The rule of the responsibility of trustees is that the trustee is bound to exercise such diligence and prudence in the care and management of the estate as, in general, men of discretion and intelligence in such matters employ in their like affairs.

Even though a loan on bond and mortgage was amply secured at the time of the making thereof by testator, the executors are not relieved from exercising supervisory care in regard thereto. They must keep themselves informed, and take notice of all things affecting the investment which a man of fair judgment, care and prudence would take into consideration in the matter of a loan of his own moneys, and likewise take all lawful means with a fair degree of promptness to recover the debt, and thereby and by all prudent means prevent a loss to the estate.

The falling behind in the payment of interest upon a loan made by testator is sufficient to put the executor to an inquiry as to the safety of the investment. A demand alone is not sufficient, and, while the executor

is not called upon to initiate legal proceedings immediately upon a default of payment of interest, on the other hand, the limit of delay is not indefinite.    Between these two extremes lies the medial line, which must depend upon all the circumstances of the case under investigation, where the law says the executor would in the exercise of ordinary prudence go forward to protect the trust estate, or, in default of so doing, become personally responsible.

The circumstances of the present case considered by the court, and the executor held personally responsible for the interest from the time he should have commenced legal proceedings to enforce payment of the loan.

Where an executor, or his agent, bids in property sold under proceedings in foreclosure of a mortgage held by the estate, the purchase is deemed to have been made for the benefit of the estate, and the executor, if he makes a profit on the transaction, must charge himself therewith.

Where upon the foreclosure of a mortgage held by an estate, property is about to be sold at a grossly inadequate price, the executor who has discretion vested in him to purchase the property on behalf of the estate, has the duty imposed upon him to purchase the same for the benefit of the estate.

Compensation to an executor for services rendered by him to the estate as clerk will not be allowed.

The executor was requested by contestant to pay to the contestant's attorney a certain sum.    The executor paid this sum, and more besides. *Held*, that the latter sum cannot be allowed to him as a payment.

Commissions of an executor cannot be paid or retained until judicially allowed, and if retained by, or paid to him, the executor is liable for interest thereon.

Just prior to her majority, a legatee was paid a sum of money by the executor to purchase her wedding outfit.   There being no claim that this disbursement was not for necessaries, and the infant having after her majority acquiesced for a long time therein without objection, *held*, that she could not repudiate the payment.

Upon the death of a legatee, a child of testator, the executor without waiting for the appointment of an administrator of the estate of said legatee, who should be authorized to receive the same, paid out of testator's estate the necessary funeral expenses of the legatee.   *Held*, that while the executor had no legal right to make such payment, that as strict legal rules are not inflexible as to such expenditures, equitable considerations should be applied to the case, and such payment allowed.

Payments by an executor to a minor can only be justified on equitable considerations and grounds of the minor's necessities, and, in such case, the executor is called upon to establish his claim for the allowance of sum so paid by the clearest proof as to the necessity, especially where under the will of testator, there was an ample provision for the support, maintenance, and education of such minor.

There is no inflexible rule that where at the end of any year there remains a surplus of income, the executor is bound to invest the same at once, as such rule would preclude the application of the income of one year to the needs of testator's family for another year, no matter what the exigencies that might call for so doing.

In all cases where the executor has been held liable for interest on funds in his hands, one or more of the elements or facts of personal use of the funds, mingling the same with private moneys, unauthorized investments, failure to follow clear and specific directions as to the disposition of funds, retention of the funds where there was no reasonable excuse for so doing, or other circumstances showing a clear case of negligence, are present; and where these elements are all absent the executor will not be charged interest on money in his hands.

Since the amendment of 1884, to § 2606 of the Code of Civil Procedure, the Surrogate has jurisdiction to compel an executor of a deceased executor to account for any trust property received by the latter as executor, or for any indebtedness of the deceased executor to the estate of his testator, and the Surrogate's court has also jurisdiction to determine the justness of such claim of indebtedness.

THE facts fully appear in the opinion.

EDWARD WILLS and JOHN CROAK, for executors.

CALVIN FROST, for contestants.

ABRAM A. DEMAREST, guardian ad litem.

THE SURROGATE.—This accounting was commenced before the late Surrogate SUFFERN, in the year 1875, and the matter was sent to an auditor before whom a considerable mass of testimony was taken. The last hearing before the auditor appears to have been had in November, 1876. After that date the proceeding seems to have been allowed to sleep until revived in the spring of 1886. In the meantime, John Butler, one of the executors, died; also, John and Richard Butler, legatees, and children of the testator. Proceedings were then had by which Anastasia Butler, the executrix of the will of the deceased executor, was

brought in as a party; administrators of the respective estates of Richard and John Butler deceased were duly appointed, and made parties to this accounting.

The auditor by consent of all parties made a report to this court of his proceedings with the testimony taken by him and thereafter the accounting proceeded before the court, and the cause is now submitted for final determination. The matter having been pending this great length of time, and to a very great extent before another Surrogate and his auditor, and having proceeded with much irregularity, the accounts being made up of the old one supplemented by an additional account, parties having deceased and the affairs of the estate having generally become confused and complicated, puts the matter in an unsatisfactory shape to dispose of in an orderly and systematic method.

And the cause having been submitted to me by counsel rather with the purpose of having the court determine certain specific questions than to make at the present a full and systematic disposition of the matter, leaving the questions of figures and details for adjustment on the settlement of the decree, I shall therefore confine myself to an examination and determination of the questions thus submitted.

I shall consider these questions somewhat in the order that counsel have presented them.

The first claim made by the contestant's counsel is that the executors should not be credited with the loss on the loan to Judge SUFFERN upon his bond and mortgage of the date of November, 1874, for $7,500.

This matter I shall consider in two respects: First:

Is it shown that the instrument considered up to the time of the completion of the loan was made under such circumstances as to show that a loss resulted therefrom, for which the executors should be held liable? Second: Is it shown that the conduct of the executors subsequent was such to the making of the loan as to make them liable for the loss, and, if so, to what extent?

The rule of responsibility of trustees is that the trustee is bound to exercise such diligence and such prudence in the care and management of the estate as, in general, prudent men of discretion and intelligence in such matters employ in their own like affairs. King v. Talbot, 40 *N. Y.* 76–85.

As to the first of the above inquiries, after careful consideration, I have arrived at the conclusion that the executors should not be held liable for the loss, if any, based upon the claim of lack of that degree of care and prudence which the law imposes upon one acting as a trustee. The burden of proof to sustain this issue rests upon the contestants, and under all the circumstances I am inclined to the judgment that the proof has not reached the requisite point of clearness, and my mind is not brought to the conviction that the executors should be held liable for such loss, if any.

One of the executors was the brother of the testator, the other, his chosen friend and business associate. It is right to assume that the testator had selected them to administer his estate because of his confidence in their integrity, business capacity and experience, and that he regarded them as men of fidelity, diligence and prudence. At the time of making this loan in

1874, only a few years had elapsed since the testator's death, and there is no evidence of nor claim made that they were not men of the same methods of business, care and prudence as at the time of the testator's death.   The loan was made to the legal adviser and confidential friend of the testator.   He was the Surrogate of the county and one in whom the executors had a right to place explicit confidence and upon whom they might rely to speak the truth and to permit them to commit no error in the management of the estate, at least wherein he was a participator, and while granting that, in this matter, it was an improper thing for the executors to loan to the Surrogate and for him to receive the same, still upon the question of good faith and prudence, it must go very far in excuse of the conduct of the executors that they believed they were entitled to make the loan, and to place perfect reliance upon and confidence in the Surrogate.   They had a right to expect that the Surrogate would check them in any wrongful administration of the estate wherein he was an actor, still more not to lead them into the commission of an act that would impose a loss upon the estate or upon the executors personally.   Of course, in this loan, it cannot be contended that in law, or as matter of propriety, that this transaction between the Surrogate and the executors was not reprehensible, but these executors were laymen, and when those who have special knowledge, experience, and men in legal authority lead the advance and no one calls a halt, would it not be a too stringent application of the rule of responsibility to hold these executors personally liable for the loss, if any, which may have come to the

estate because of the investment originally?    There is
grave doubt whether loss resulted from imprudence
in *making* the instrument.    It is rather to be attribu-
ted to subsequent lack of diligence and care.

The safety of the investment was somewhat con-
firmed by the prompt payment of the interest thereon
for several years and confirmatory of the judgment
of the executors that the value of the property was
sufficient at the time to secure the loan.    Again, it
must be remembered that this security was taken for
moneys which had come to Judge Suffern's hands as
the result of an action commenced by the testator
himself.    The moneys had never been in the hands
of the executors.    They obtained security for that
which therefore was not secured.

Another circumstance showing the prudence of
these executors is the fact that in making loans for
the estate, no loss has come to the estate out of any
other of the many investments made by them.

As to the second inquiry, I am of the opinion that
a loss has resulted from the failure of the executor,
Wiles, to exercise that degree of diligence required
of him in looking after this investment.

The executors, even though the security was suffi-
cient at the time of making the loan, were not re-
lieved from exercising supervisory care over the
investment thereafter.    They were still bound to be
watchful; to keep themselves informed as to whether
or not a depreciation in value of the security was
taking place from any cause; to see that the interest
was paid with a.reasonable degree of promptness; to
keep informed as to the pecuniary responsibility of

the obligor, and, in fact, to keep themselves informed and to take notice of all these things affecting the investment which a man of fair judgment, care and prudence would take and keep into consideration in a matter of a loan of his own moneys, and likewise to take all lawful means with a fair degree of promptness to recover the debt, and thereby and by all prudent means prevent a loss coming to the estate.

Herein I think the evidence shows that the executor, Wiles, has clearly failed in his duty. As early as the year 1877, Judge SUFFERN began to fall behind in the payment of interest. While the interest was payable semi-annually, he did not pay the interest due November, 1877, until May, 1878. Interest accrued from November, 1877, to the time of the judge's death in March, 1881, a period of upwards of three years; and, on account of which was paid, according to the accounts, at different times and in various sums, in the aggregate about $557, the last of which seems to have been paid more than a year prior to his death, thus leaving unpaid, when the last payment was made in February, 1880, more than two years interest.

This falling behind and neglect to pay as heretofore was something to put the executor upon inquiry as to the safety of the investment, yet he appears to have made none in any respect. His attempt to collect seems to have been limited to demand only. No legal proceedings were taken to enforce payment until October, 1882, thus leaving some four years interest unpaid before legal measures were taken to recover the debt.

This long delay is inexcusable.   Nothing is offered that can be taken as a sufficient explanation of so long delay.   Even if it be granted that the executor was not called upon to initiate legal proceedings to enforce payment immediately upon default of payment of the interest; on the other hand, the limit of delay is not indefinite; between these two extremes lies the medial line where the law says the executor should in the exercise of ordinary prudence, go forward to protect the trust estate, or in default of so doing, become personally responsible.   When this line is reached must depend upon all the circumstances of the case under investigation.

In this matter no other reasonable conclusion can be reached than that the executor has incurred a personal liability.   I think a year's delay, in view of all the circumstances, among others the fact that the principal was past due, amply sufficient time for delay of legal proceedings.   This period was reached about November, 1879.   From that date up to the time of the commencement of the foreclosure (November, 1882), I think the executor should be held for the loss of interest, at least, upon the value of the mortgaged premises which I fix for this purpose at the sum of $4,000.   From this period, however, should be deducted the time of the illness of Judge SUFFERN, when his sickness was of such character that under the advice of his physicians, it was dangerous to press business matters upon him.

The executor was not called upon to violate the common rules of humanity.   I think that he is excusable for the delay covering that period, and which I fix as

nearly as the evidence will enable me to do so, at four months. The period reaching from the date of Judge SUFFERN's death to the time of granting letters of administration in his estate should also be excluded. I do not think the delay (about two months) was such as to call upon the executor to force the application for administration.

I am of the opinion, also, that the executor should be held for the difference between the price at which the mortgaged premises were knocked down at the sale, being $3,200, and the price at which the same were subsequently sold—$5,000,— and the interest such difference has since earned, deducting the expenses incurred in bringing about the sale of the $5,000 and other expenses, such as taxes, up to the time of the sale.

If Mr. Wells bid as agent or in behalf of Mr. Wiles, then, under the well-settled rule that one acting in a fiduciary capacity cannot deal with the trust estate to his own personal benefit, applies, and the purchase must be deemed to have been made for the trust estate, and Mr. Wiles must charge himself with this profit. 3 Redf. on Wills, 234, 403. On the other hand, if the executor entertained the judgment that he always claimed that he did as to the value of the mortgaged premises, then the exercise of proper care for the estate I think called upon him to purchase the property for the estate and thus prevent a loss which in a measure might have been averted. His attorney regarded it as a "pity that the property did not bring more," and, therefore, took occasion to purchase the same, and if he purchased for himself it must have

been because he thought it a speculation to do so at the extremely low price at which it was being sold.

Here was property that the executor, unless he confesses his own delinquency, believed to be fair security for $7,500 principal and upwards of $2,000 interest, or an aggregate of upwards of $9,500, which he permits to be sold for $3,200, and, standing by, neglects in the exercise of a discretion vested in him to purchase the property in behalf of the estate, and in view of the heavy loss that must come to the estate if he permitted the same to go to a stranger.    3 Redf. on Wills, page 234 and cases there cited.  Ibid., page 555. Indeed, it was his duty to purchase under the circumstances. . Clark v. Clark, 8 *Paige*, 152.

Objection is made to the credits for clerk hire.   I think the exception is well taken.   The evidence does . not show payment to a clerk, but a retention of funds by the executor, Wiles, for his own services in that respect.   No vouchers or receipts are produced as required by section 2734 of the Code.

In such case payments for clerk hire are not allowable.   Lent v. Howard, 89 *N. Y.* 179, and cases cited. In Collier v. Munn, 41 *N. Y.* 143, compensation was refused an executor for legal services that he had rendered the estate, and in Clinch v. Eckford, 8 *Paige* 412, compensation to an executor for services rendered by him as clerk was disallowed.   The reason of the rule precluding such allowances is equally applicable, even though the firm of A. & M. & W. H. Wiles were compelled to hire a clerk to perform the services which the executor might have performed if he had not per-

formed these services for the estate. This is only an indirect method of compensating the executor.

I am convinced that the affairs of the estate were such as to permit the executors to employ a clerk and to charge the estate with payments therefor, and I am not prepared to hold that the fact that the accounts have not been kept in a skilful form would preclude the allowance of the payments if they had been made to a clerk, but no clerk is shown to have been employed or paid. The executor rendered this service and I am bound by the authorities to disallow any claim of compensation therefor. As was observed by Judge WOODRUFF in Collier v. Munn, *supra*, "with the unreasonableness of the resistance to this claim of the executor, which, in this case, is for a valuable service, rendered in good faith far beyond what his duties as executor required, or with the eminent propriety of payment for a service from which the parties have apparently derived so considerable a benefit, we cannot deal."

The payments to Mr. Hoffman, counsel for the contestants, in excess of $500, do not seem to have been made by their authorization, and cannot therefore be allowed. The first $500 was paid under written authority, the others not. Why did not the executors require the like authority as to the others? It appears to me that they should have required clear direction or permission, in view of the fact that they were paying the attorney of the adverse party. More than five years elapsed between the last payment of the first $500 and the first payment of the last $500. This disconnects the latter payment from the order under

which the first $500 was paid. The letters and receipts of Mr. Hoffman submitted to me rather indicate that these latter payments were not made under any order but were for services rendered the executor Wiles in prosecuting the claims against the executor, John Butler.

As to these payments, the burden is upon the executors to establish authority to make them, and I do not find sufficient evidence of it. If there were I should allow them, as the loss to the executor is an unfortunate one which justice calls upon the court to prevent, if possible, but I think that the matter is one that I should have clearly established inasmuch as the payments were to the adverse attorney. Of course, I have nothing to do with the amount of compensation that Mr. Hoffman should have from his clients.

The payment by the executor Wiles to his co-executor for commissions cannot be allowed. It is a well-settled rule that commissions cannot be paid or retained until judicially allowed. Wheelwright v. Rhoades, 28 *Hun*, 57; U. S. Trust Co. v. Bixby, 2 *Dem*. 494; Freeman v. Freeman, 4 *Redf*. 211. And if retained or paid, the executor is liable for interest thereon. Matter of Peyser, 5 *Dem*. 244.

The matter of proportioning the commissions as between the executors so as to protect the executor, Wiles, against this error may be adjusted on settlement of the decree.

Objection is taken to the allowance to the executors of certain payments made to the legatees, John and Richard Butler, and Honora Dinan, because of the same having been made while these legatees were in-

fants. These items are $500 to Mrs. Dinan, October 20, 1875, items aggregating $6,259.98 to or for John Butler between August 10, and November 22, 1875, and to some twenty items to or for Richard Butler aggregating $1,232.90, of which $441.50 was paid by the executor Butler, and the balance of $791.40 by the executor Wiles.

The payment to Mrs. Dinan was made by the executor Wiles just prior to her arrival at twenty-one years of age for her "wedding outfit." I think that she does not claim that the payment was not one for necessaries. This being so, it is allowable within the rule cited by her own counsel from Hyland v. Baxter, 42 *Hun* 9. It does not appear that the widow, Mrs. Butler, was either able out of the income or willing to make this provision for Honora's marriage. Besides, her failure to repudiate the payment and long acquiescence in the same, should preclude her at this late day from repudiating the payment.

The payments to John Butler should be allowed to stand as stated in the accounts, if for no other reason than that while this accounting was pending he expressly assented to the same in the writing and thereafter received other payments based upon the provisions of such writing. I think his administratrix is barred by his acts in that respect inasmuch as no claim of error or mistake is made. The sole ground of objection being infancy at the time of payment, these payments were thus confirmed by him after he arrived at maturity. The executor Wiles should receive credit for all of these payments made by him, as, also, the executor Butler for his payments, except as to such

payments as were made out of or on account of the proceeds of the $30,000 mortgage or other alleged indebtedness or connected therewith, which payments should stand over as hereinafter indicated as to like payments made to Mrs. Dinan.

As to Richard Butler, of the amount of $791.40 paid by Mr. Wiles there were three items aggregating $14.25, which seem to have been for necessary traveling expenses and physician's bills. These should be credited. The balance of the sum appears to have been paid for Richard's burial expenses. As to these items, Mr. Wiles had no legal right to make such payments upon the death of Richard; he should have ceased paying on account of his estate until the appointment of an administrator therefor, who would be authorized to receive Richard's estate and out of the same to pay the burial expenses. Instead of so doing, the payment was made direct by Mr. Wiles. This avoided circumlocution, but was not in accordance with legal requirement. The payments were no doubt made in good faith, and in equity, Mr. Wiles should be reimbursed. Can he be allowed to retain the same out of Richard's estate, or must he pay the whole estate to his administratrix and then seek reimbursement from that source?

The expenditures are not challenged on any other ground than infancy. Surely the necessity of incurring burial expenses cannot be controverted. The amount is not attacked as excessive, and if it were, the extent of his estate, he being unmarried, and being a minor probably having no creditors, I think the expenses cannot be said to be too large.

I cannot therefore escape the conviction that justice and equity call for an allowance of these payments.

It has been held that the strict legal rules are not inflexible as to such expenditures, and that in case of a departure from his legal duty by a trustee in the event of entire good faith and when there are equities in his favor and the expenditures have been made to serve the necessities of the minor, equitable considerations will be applied to reimburse the trustee. Hyland v. Baxter, 42 *Hun* 9; 98 *N. Y.* 610.

I think here may be found the basis for an allowance of the payments and a retention of the same out of Richard's estate. No injustice will be done to any party by so doing and the payments are accordingly allowed.

As to the payments made by the executor Butler, I am not convinced of their necessity, except as to the items for clothing and tuition. No vouchers are produced and no evidence as to the purposes of the payments has been adduced, except such as may be discovered from entries in the accounts. Nothing appears to show the purposes for which the moneys were paid. Most of the payments were cash to the minor. These items should have been explained, for the executor had no legal right to make them. He could only be justified on equitable considerations and grounds of the minor's necessities. The executor was certainly not at liberty to hand over money to the minor without knowing of and approving the purposes for which it was to be used. Kelaher v. McCahill, 26 *Hun* 148. Especially in this matter is the

executor called upon to establish his claims for these allowances by the clearest proofs, inasmuch as the testator contemplated by his will the making of ample provisions for the support, maintenance and education of his children through the provisions for payment of all income to the widow to be applied by her for all of these purposes.

Again, no receipts for the moneys paid to Richard are produced, and in view of the evidence touching the $30,000 mortgage and the book account, and as to payments made therefrom to Mrs. Dinan and the declared intention of the executor Butler to pay the children their respective shares of the same, it may be that these payments to Richard were gratuitous, for which the executor intended making no charge, or that they were payments on account of these claims.   The fact that during this time the executor Butler claimed that he had no funds of the estate in his hands unless he was indebted on these claims is confirmatory of this view.   I think these payments to Richard should be disallowed, except those for clothing and tuition.

I am of the opinion from the evidence that the payments made by the executor Butler to Mrs. Dinan were made out of the proceeds of the $30,000 mortgage, or because of the receipt thereof by him.   He took no receipts for the payments, which gives the impression that he did not pay as executor, especially when leaving out of consideration the mortgage moneys or the book account he had no estate funds out of which to pay.

But as there is an action pending to recover the $30,000 from the estate of the executor Butler, I think

these payments to Mrs. Dinan should stand over for allowance or disallowance either in that action or in a final judicial settlement of the estate.

The contestants object, also, to the allowance of certain payments not appearing in the accounts but testified to by the executor Wiles, on July 1 and July 2, 1887, to have been made by his firm for the estate to the legatees. They are as follows : $150 to John Butler, legatee, and this I think should be allowed,— but has not credit been given in the account by the payment of $200 credited on the same day ?— $200 to Mr. Hoffman December 19, 1876, and $210 to him March 19, 1877, these being payments to the contestant's counsel, the first of which has been allowed as part of the $500 order, and the latter being one of the payments in excess of that sum must be disallowed for reasons above assigned as to other unauthorized payments. I may here add that I have not, nor do I consider the status of the claim of Mr. Hoffman as against his clients for compensation.

There is no check for a payment of $200 to Bridget Butler, November 21, 1876. There is one February 21, 1876. The executor however is credited for a payment of that sum in his accounts on the same date, and I believe it to be the one made by the check of A. M. & W. W. Wiles. But one receipt is produced. The payment of $81.09 to John Butler is sustained by his receipt, but it is already credited in the accounts.

The $200 to Mrs. Butler, September 26, 1876, I think must be allowed, as, also, $500, August 8, 1881. They are sustained by vouchers. The former is known already, credited in the account, and may not

the latter payment be included in the $800 credit of the same date? If not, there is no voucher for it. I do not see that the payments to Mr. Wiles of $200 August 23, 1881, and $150 March 9, 1881, on the "Murkey" investment are to be considered, as the executors may have already been once credited with the funds invested in the security. I shall not pass upon these items at present but reserve them until settlement of the decree. A payment to Mrs. Butler of $500, July 24, 1882, is already credited in the accounts and a voucher filed therefor. I think this must be the same. The payment of $75 to C. P. Hoffman, June 3, 1884, has already been disallowed.

We come now to the consideration of the questions of interest with which the contestants claim that the executors should be charged.

The first of these claims is that the executors should be charged with interest on the balances of interest in hand at the end of each year in excess of the balance in bank.

This proposition assumes as matter of fact that the evidence shows such balances. I am not so convinced. Mr. Wiles testifies that all moneys collected by him were deposited in his executor's bank account; that none of the funds were mingled with his individual or firm moneys or used by himself or by his firm, excepting the loans which will hereafter be considered.

The schedules submitted by contestant's counsel to show such balances apply a rule that for rigidity is not sustained by any authority. It is assumed that every dollar of the estate funds was continuously invested, whereas, in fact, there was according to the

testimony, and according to all experience must necessarily be, intervals between receipts and investments or opportunity to invest. It is further assumed that all interests, rents, or other income were received on the very day whereon they were payable, while the evidence shows the contrary, and it would be a most remarkable administration, if it were otherwise. It is assumed, also, that no losses have come to the estate. The evidence shows a considerable loss on the Suffern mortgage. In fact, everything is assumed against the executors.

But if there were balances, unless they were considerable and it were very clear that the executors would not be called upon to pay the same over to the widow, Mrs. Butler, under the provisions of the will, it would be a harsh and unjust rule that would charge them with interest on such balances. If it so happened that at the end of any year there remained a surplus of income, I do not see that the executors were bound to invest at once. To so hold, would preclude the application of the income of one year to the needs of the family for another, no matter what the exigency that might call for so doing. I do not think that the testator contemplated such limitation. His intention as gathered from the will was to make liberal provision for the needs of his family. Indeed, I cannot see that so long as the executors did not mingle the estate funds with their own or use or apply the same to their own personal benefit, why they should not hold balances of income without being chargeable with interest, unless they became so large as to make it perfectly clear that they would not be

needed to meet any exigency calling for an increase of expenditures for the necessities of the family. It must be remembered that in the course of family affairs, and in this case it was an experienced fact, that as the children advance in age the expense of maintenance and education increases. I am not, as now impressed, disposed to charge the executors with interest under this claim. As to the claim that there were uninvested balances of principal funds and that the excutors should be charged with interest on the same, I cannot so hold upon the proofs, certainly not unless some data are submitted to me based upon the proofs, showing such balances, and that opportunity to invest was offered, or that the executor himself used the funds, if such there were, or in some other way disposed of them to his personal benefit. Mr. Wiles denies all of these propositions, or allegations, and no one contradicts him except as to opportunity to invest, by Mrs. Butler, but Mr. Wiles says that he had no funds to answer such demand. Besides, these applications were made, some of them at least, while these proceedings were pending, and I think he could properly refuse and hold the funds in the Trust Company as he did, to await the determination of this accounting.

If Mr. Wiles is in error about there being no uninvested balances, it must appear from an investigation of the investments at stated periods; but until such appears to be the fact, I must assume that there were none, except during short intervals, awaiting investment.

The cases cited by the learned counsel for the contestants do not sustain his contentions in these mat-

ters. The principles enunciated in them are sound and salutary as applicable to the particular case determined. No general principle can be laid down that will be applicable to all cases, and indeed scarcely in a second case, because of the diversity of facts and circumstances. As was said by Mr. Justice CHURCHILL in Thorn v. Garner, 42 *Hun* 507–515, there is no uniform rule of redress in cases of this kind, but each calls for the exercise of the judicial discretion of the court.

The rule laid down in Spear v. Tinkham, 2 Barb. Ch. 211, was one of justice as applied in that case. But in that, the estate funds had been intermingled and loaned by the executor with his own moneys, and no estate accounts kept. These elements do not enter into this case. So in Schieffelin v. Stewart, 1 Johns. Ch. 620, the administrator held the funds of the estate several years, amounting at times to upwards of $50,000. He could have distributed the estate in whole or in part after a year, although the court allowed him two years. He could have placed the funds where they would have been productive to the heirs. He did neither but *employed the moneys in his own business, or in making large loans for his own benefit,* kept no accounts and mingled the funds with his own.

King v. Talbot, 40 *N. Y.* 76, is not in point. That was a case of unauthorized investment and the *cestui que trust* had his election to take the investment with profits, or to hold the executors as for so much of the estate funds loaned to their own personal benefit and the interest that might have been earned

therein.    In the case of Shepard v. Patterson, 3 *Dem.*
183, there was no excuse for the failure to invest as the
will directed a deposit of the funds in a savings bank.
The executor refused to obey this specific and clear
direction, and was held liable for such interest as the
moneys would have earned in such a bank.    In Run-
dle v. Allison, 34 *N. Y.* 180, and Gray v. Thompson,
.1 Johns. Ch. 82, the trustee was held liable for interest
*for failure to pay over funds* and based upon the pre-
sumption, *in the absence of proof to the contrary,* that
the fund *had been appropriated to his own use.*    That
is not this case.

Indeed, no case has been cited wherein the facts
were similar to this where the trustee has been charged
with interest, nor have I found any such case.

In all the cases where the trustee has been held lia-
ble for interest on funds in his hands, one or more of
the elements or facts of personal use of the funds,
mingling of the same with private moneys, unauthor-
ized investment, failure to follow clear and specific
directions as to the disposition of funds, retention of
the funds where there was no reasonable excuse for so
doing, or other circumstances showing a clear case of
negligence, were present.

In this case, all of these elements are absent as to
claims of interest on the balances, if any, in the hands
of the executor.

As to loans made to the firm of A. M. & W. H. Wiles,
the executors must be charged with interest on the
same with annual rests, except in cases of payments on
account exceeding interest due at the time of payment,
in which instances rests must be also had at the time

of any such payment.   The rate of interest should be seven per cent to January 1, 1880, and six per cent thereafter.   But upon so much of the debt as was paid by the deposit of the $6,000 in the Trust company, June, 1886, the estate is entitled to only interest at the rate earned in that institution.   This proceeding was then pending and the executor was justified in holding the funds in readiness to abide the determination of this accounting and therefore was excused from making a permanent investment.

This seems to me the contestants have a right to claim, and is no more than compensatory.   The executor has no just ground to complain of this ruling. It is no answer to say that if the interest had been paid annually that it might have remained uninvested, for the firm neglected making the payments and thus cut off the opportunity to invest.   The following authorities sustain the conclusion I have reached. Jones v. Foxhall, 15 *Beav.* 388 ; Morgan v. Morgan, 4 *Dem.* 353.

The claim that the executor Wiles is liable for any moneys due from his co-executor has not been pressed and I therefore dismiss that question without consideration.

I come now to the claim that the executrix of the will of John Butler, the deceased executor, who was brought in as a party to this proceeding, should be charged in this accounting with the indebtedness of her testator to this estate.   Prior to the amendment of section 2606 of the Code of Civ. Pro., in 1884, it was settled by authority that an executor of a deceased executor could be called to an account only for, and

directed to pay over such assets as were shown to have come into his possession or under his control.    Matter of Fithian, 42 *Hun*, 457.    See Surrogate's opinion. I have so held.    See MS. opinion in this office in Matter of Zinn.    It was held further in the Matter of Fithian, *supra*, that the effect of the amendment of 1884 is to confer jurisdiction to compel an executor of a deceased executor to account for any trust property received by the latter.    The saving provision in the amendment as to the effect of the decree, lends corroboration to such construction.    I shall therefore adopt this construction upon the authority cited without further consideration of the question.

It is provided by statute that "The naming of any person as executor in a will shall not operate as a discharge or bequest of any just claim which the testator had against such executor, but such claim shall be included among the credits and effects of the deceased in the inventory and such executor shall be liable for the same as for so much money in his hands at the time such debt or demand became due; and he shall apply and distribute the same in the payment of debts and legacies, and among the next of kin as part of the personal estate of the deceased." 3 R. S. 84, § 13 (8th ed. 2558).

Thus it seems that if the testator, Patrick Butler, had at the time of his death a just claim against the executor, Butler, then he was liable for the same "*as for so much money in his hands*" at the time the debt became due, and he was bound to apply the same "as part of the personal estate of the deceased."    It seems from the specific language of the statute that such

claim, if "just," was thus made assets in the hands of the executor as much as though a claim against another debtor had been paid to him.   The statute was so construed in Baucus v. Stover, 89 N. Y. 1. The question of the *justice* of the claim it has been held, may be tried in a Surrogate's Court.   Everts v. Everts, 62 Barb. 577.

It seems then to follow that the rule laid down in Matter of Fithian, *supra*, is applicable and the executrix of the deceased executor, Butler, must account for the claim, if established as *just*, as if so much moneys of the estate had been in the hands of her testator at the time of his death.

But can the question of the justness of the claim be litigated in this court and in this proceeding after the death of the deceased executor?   Section 2606 as amended provides that this court shall have the same jurisdiction to compel the executor of the deceased executor to account which it would have against the decedent if his letters have been revoked by a Surrogate's decree, and by section 2724 *et seq.* it is enacted that in case of the revocation of letters, power is given to compel a full accounting, as in other cases of judicial settlements.

So that it would seem that if the debt were due prior to the death of the executor Butler, the same had then become assets in his hands and that his executrix might be called upon to account for the same in like manner as her testator might have been if living and his letters had been revoked.   In such case he would have been obliged to litigate the question of the justice of the demand in this court and to

give force to the provision quoted above from section 2606, it would follow that the executrix must also try that question here.

Furthermore, this claim was litigated in this proceeding without objection during the lifetime of the executor, and most of the testimony bearing upon that question taken while he was still living.

I shall, however, defer finding upon the question of the establishment of the claim until the settlement of the decree. The pleadings in the action brought against the estate of the deceased executor are not before me and I am not therefore advised whether or not this claim of $9,000 is sought to be recovered in that suit. I think that the whole matter of debits and credits of the deceased executor should if practicable be disposed of as one subject matter and in the same proceeding or action, either upon a continuance of this accounting or in the pending action.

As to the written agreement or stipulation entered into between the legatee, John Butler, and the executors, June 11, 1877, I think it should be given effect agreeable to its terms. It is but a stipulation entered into in a pending cause which establishes certain facts without further proof or contention and as a basis of settlement according to its terms. So far it is binding, and no farther. It is not nor does it purport to be a general release. I must hold it binding like any other agreement as there is no attack made upon it because of fraud or other vitiating cause, and no proof has been given to sustain any such claim.

The addition at the foot of the writing indicates clearly that no matters not entered in the accounts

were considered, and even as to those in the accounts which are clearly or concededly mistakes, the same are left open for correction in this accounting. All of such will be adjusted upon settlement of the decree.

I have now given consideration to all questions that have been submitted to me by counsel and made such disposition of them as the rules of law and equity applicable to the matter, when applied to the facts of the cause, have seemed to me to require.

I may add that in considering these questions and in arriving at conclusions, I have attributed to the executor Wiles entire good faith in the administration of the estate. I believe that it has been his purpose to be faithful to the trust imposed upon him by the testator and to carry out the wishes of the testator as to his widow and children. He has fallen into some errors unfortunately for himself, but this is not surprising when wiser heads, learned in the law and of full experience have not only permitted him to stray, but to an extent led the advance into the way of error.

Nor do I think that the widow or legatees or their representatives believe that Mr. Wiles has not acted fairly, honestly and in good faith toward their interests. I do not believe that either of them is willing to say, after a retrospective view of the administration of the estate and its settlement that the friend of the testator and the lifelong neighbor of all of them, has not acted with honesty and in uprightness, and that his mistakes were intentional errors. The case is one where both sides should have costs, and I shall grant the same accordingly. Let each side present a bill for taxation.

A decree may be presented for settlement by either party upon notice in accordance with the conclusions I have reached.